UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.: 1:20-cv-22133-MARTINEZ

RYAN MAUNES MAGLANA
and FRANCIS KARL
BUGAYONG *on their own behalf
and as a class representatives of all
other similarly situated Filipino
crewmembers trapped aboard*
CELEBRITY *cruise vessels,*

      Plaintiffs,

v

CELEBRITY CRUISES INC.,

      Defendant.

_____/

## CLASS ACTION & DEMAND FOR <u>JURY TRIAL</u>

### <u>AMENDED COMPLAINT FOR EMERGENCY INJUNCTIVE RELIEF & DAMAGES</u>

Plaintiffs, RYAN MAUNES MAGLANA and KARL FRANCIS BUGAYONG, on their own behalf and on behalf of all other similarly situated Filipino crewmembers trapped onboard CELEBRITY cruise vessels (hereinafter "PLAINTIFFS"), through undersigned counsel and pursuant to Federal Rule of Civil Procedure 15 (a)(1)(B), hereby sue Defendant, CELEBRITY CRUISES INC. (hereinafter "CELEBRITY"), and allege:

#### <u>JURISDICTION AND PARTIES</u>

1.    This case arises out of Defendant's systemic, companywide discriminatory treatment of its Filipino employees in violation of federal and applicable state civil rights

laws, including but not limited to under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* prohibiting discrimination on the basis of national origin in employment. However, at the time this submission was filed with the Court, Plaintiffs have submitted charges to the EEOC, but have not yet received the "Right to Sue" Notice from the Equal Employment Opportunity Commission (hereinafter "EEOC") due to the agency's decision to suspend the issuance of notices indefinitely due to the Coronavirus pandemic. Plaintiffs concede that this may render Defendant's discriminatory conduct not ripe for adjudication for the time being but respectfully submit to the Court that the interests of justice demand a remedy for individuals who are suffering discrimination and the exigent circumstances involved in this crisis provide ample support for the Court to enter relief in their favor.

2.      Plaintiff, RYAN MAUNES MAGLANA, is a citizen of the Philippines and was employed by Defendant on its vessel the *Millennium*. Plaintiff MAGLANA was an employee of Defendant CELEBRITY for over 14 years and during his most recent contract of employment with Defendant was employed as a Beverage Controller onboard the *Millennium*.

3.      Plaintiff FRANCIS KARL BUGAYONG, is a citizen of the Philippines and was employed by Defendant on its vessel the *Millennium*. Plaintiff BUGAYONG was an employee of Defendant CELEBRITY for over 4 years and during his most recent contract of employment with Defendant was employed as a Bar Storekeeper onboard the *Millennium*.

DELGADO TRIAL ATTORNEYS • 10631 N. KENDALL DRIVE, SUITE 130 • MIAMI, FL 33176
O: (305) 596-7911 • C: (305) 927-3678 • TOLL FREE (877) 372-0817 • F: (305) 397-2654
WWW.CRUISELAWYERMIAMI.COM

4.      Defendant, CELEBRITY CRUISES INC., is a foreign entity which conducts its business from its principal place of business in Miami, Florida.

5.      This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because this action is brought under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* prohibiting discrimination in employment on the basis of national origin.

6.      In the alternative, Plaintiffs allege that this Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1333 under the Court's admiralty jurisdiction.

7.      The causes of action asserted in this Complaint arise under the General Maritime law of the United States and/or 46 U.S.C. Section 10313. The claims exceed the jurisdictional amount of this court, exclusive of interest and costs. This controversy is a class action brought under Federal Rule of Civil Procedure 23 and pursuant to 28 U.S.C § 1332(d)(2) in addition to Federal Rule of Civil Procedure 65.

8.      Defendant, CELEBRITY, at all times material, personally or through an agent:

   a.  Operated, conducted, engaged in or carried out a business venture in this state and/or county and/or had an office or agency in this state and/or county;

   b.  Was engaged in substantial business activity within this state;

   c.  Operated vessels in the waters of this state;

Delgado Trial Attorneys • 10631 N. Kendall Drive, Suite 130 • Miami, FL 33176
O: (305) 596-7911 • C: (305) 927-3678 • Toll Free (877) 372-0817 • F: (305) 397-2654
www.CruiseLawyerMiami.com

    d.   Committed one or more of the acts stated in Florida Statutes, Sections 48.081, 48.181 or 48.193; and/or

    e.   The acts of Defendant set out in this Complaint occurred in whole or in part in this county and/or state.

9.    Defendant is subject to the jurisdiction of the Courts of this state.

10.    At all times material hereto, Defendant owned, operated, managed, maintained and/or controlled a fleet of cruise ships, including the cruise vessel *Celebrity Millennium* where Plaintiff MAGLANA & BUGAYONG were held captive in addition to and thirteen (13) sister cruise ships and expedition ships in its worldwide fleet, including in no specific order, the: *Silhouette, Apex, Solstice, Summit, Eclipse, Equinox, Edge, Infinity, Reflection, Constellation, Flor[1], Expedition[2], and Exploration[3].*

11.    At all times material hereto, Defendant operated the vessels in navigable waters.

12.    At all times material hereto, the *Celebrity Millennium* and *Eclipse* were docked at the port in San Diego, California, and subject to the jurisdiction of the US federal courts, but at all times material, the vessel was operational and capable of navigation.

13.    At all times material hereto, Defendant's base of operations and corporate headquarters are located in Miami, Florida.

---

[1] These ships are smaller "expedition" class ships which Celebrity uses for voyages to ecologic sanctuaries such as the Galapagos Islands.
[2] Id.
[3] Id.

DELGADO TRIAL ATTORNEYS • 10631 N. KENDALL DRIVE, SUITE 130 • MIAMI, FL 33176
O: (305) 596-7911 • C: (305) 927-3678 • TOLL FREE (877) 372-0817 • F: (305) 397-2654
www.CruiseLawyerMiami.com

14.     At all times material hereto, Plaintiffs were "seamen" aboard their respective vessel to which they were assigned by Defendant to work, as the term "seamen" is defined under U.S. General Maritime Law and/or Title 46 of the U.S. Code § 10101.

15.     "Seamen from the start were wards of admiralty." *U.S. Bulk Carriers, Inc. v. Arguelles*, 400 U.S. 351, 355 (1971) (*citing Robertson* v. *Baldwin*, 165 U.S. 275, 287 (1897)). In 1823, Justice Story declared: "Every Court should watch with jealousy an encroachment upon the rights of a seaman, because they are unprotected and need counsel; because they are thoughtless and require indulgence; because they are credulous and complying; and are easily overreached. But Courts of maritime law have been in the constant habit of extending towards them a peculiar, protecting favor and guardianship. They are emphatically the wards of the admiralty." *Harden v. Gordon*, 11 Fed. Cas. 480 (No. 6047) (C.C. Me 1823). "From the earliest times maritime nations have recognized that unique hazards, emphasized by unusual tenure and control, attend the work of seafarer." *See Aguilar v. Standard Oil Co. of New Jersey*, 318 U.S. 724, 727 (1943). The *Aguilar* Court further held: "**the restrictions which accompany living aboard ship for long periods at a time combine with the constant shuttling between unfamiliar ports to deprive the seaman of the comforts and opportunities for leisure, essential for living and working that accompany most land occupations**." *Id*. at 728. (emphasis added)

16.     In *Chandris, Inc. v. Latsis*, the U.S. Supreme Court reaffirmed the longstanding principle that seafarers are wards of Admiralty Courts, given the "feature of the maritime

**Delgado Trial Attorneys • 10631 N. Kendall Drive, Suite 130 • Miami, FL 33176**
**O: (305) 596-7911 • C: (305) 927-3678 • Toll Free (877) 372-0817 • F: (305) 397-2654**
**www.CruiseLawyerMiami.com**

law that compensate[es] or offset[s] the special hazards and disadvantages to which they who go down to sea in ships are subjected." 515 U.S. 347, 355 (1995). The Fifth Circuit Court of Appeals explained the rationale for affording seafarers special protections in *Castillo v. Spiliada Maritime Corp.,*: "[Seafarers] enjoy this status because they occupy a unique position. **A seaman isolated on a ship on the high seas is often vulnerable to the exploitation of his employer. Moreover, there exists a great inequality in bargaining position between large ship-owners and unsophisticated seafarer**. Shipowners generally control the availability and terms of employment." 937 F.2d 240, 243 (5th Cir. 1991) (emphasis added).

17.     Accordingly, the Admiralty Courts have a rich tradition of protecting seafarers, which flows from the uniquely abhorrent conditions seafarers face at sea. And it is not just the Courts which recognize the need to protect seafarers, as "[t]he policy of Congress, as evidenced by its' legislation, has been to deal with [seafarers] as a favored class." *Bainbridge v. Merchants' & Miners' Transp. Co.,* 287 U.S. 278 (1932).

18.     Plaintiffs including class representatives MAGLANA and BUGAYONG, and their fellow Filipino class members worked for Defendant aboard Defendant's vessels, were employees of Defendant until it unilaterally terminated their contracts at various points in time since the CDC's March 14th no-sail Order and stopped paying agreed upon wages shortly thereafter.

<u>**ALLEGATIONS COMMON TO ALL COUNTS PERTAINING TO DEFENDANT'S UNLAWFUL CONDUCT IN VIOLATION OF INTERNATIONAL LAW & U.S. LAW**</u>

19.     The basis of the class action stems from Defendant CELEBRITY's callous and inhumane business decision to keep crew members from specific countries captive

on board its passenger-less ships with no wages and no hopes of going home to family members in need, including infants, children, and elderly parents.

20.      Despite having actual knowledge that the CDC had issued a no sail order as early as March 14, 2020 and the supplemental orders issued thereafter have prohibited cruise ships from operating in US waters through at least midsummer, a date which remains at risk to be delayed even further.

21.      In fact, the *Millennium* where Plaintiff MAGLANA is currently being held captive has been without passengers since February 10th, 2020, nearly 100 days ago.

22.      At that time, only Vietnam and Singapore would agree to allow the ship to dock at their respective ports after rejections at Hong Kong and Thailand. The ship stayed in Singapore after disembarking its last passengers on February 10th until February 14th, when the vessel departed from Singapore and sailed east to Manila, arriving in the Philippine capital on February 19th, 2020.

23.      At the time, many of the vessel's Filipino seafarers were excited at the prospect of returning to their home country and hopeful that they would be allowed to return home if the company was going to cancel cruises.

24.      Unfortunately, the excitement was short lived and left just as quickly as it came. Less than twenty-four (24) hours after arriving in Manila Bay, PLAINTIFFS onboard the *Millennium* were cruelly taken from Manila in what felt like moments the ship's Filipino seafarers eager to return home to their loved ones.

Delgado Trial Attorneys • 10631 N. Kendall Drive, Suite 130 • Miami, FL 33176
O: (305) 596-7911 • C: (305) 927-3678 • Toll Free (877) 372-0817 • F: (305) 397-2654
www.CruiseLawyerMiami.com

25.     The only crewmembers that were allowed to disembark for repatriation were those that both had concluded their contracts and had a suitable replacement onboard.

26.     CELEBRITY, apparently oblivious to the media frenzy that was beginning across the globe which had begun to focus on the cruise lines collective role in facilitating the virus's spread, and the ancillary fact that ships in its fleet, *Millennium* included, had already been passenger-less for close to 10 days.

27.     The ship's remaining Filipino crew were prevented from disembarking the ship despite it being obvious that there would be little need for vessels to be fully manned for the foreseeable future.

28.     Despite the pleas of crewmembers on board to be allowed to disembark in their home port of Manila, Celebrity elected to refuel the *Millennium* and continue eastward to the western U.S. seaboard after a stop in Honolulu. The stop in Honolulu on March 1st came and went but the company was still reluctant to make a final decision to repatriate its crew, so the vessel sailed on eastward. Finally, the ship arrived in Ensenada, Baja California in Mexico on March 11, 2020.

29.     In the interim, on March 13th, 2020, Royal Caribbean, CELEBRITY's parent company, suspended all of its future cruises, including those associated with its subsidiary companies, such as CELEBRITY. The following day, on or about March 14, 2020, the CDC issued its first No Sail Order.

30.     Thus, without any doubt whatsoever, Defendant CELEBRITY knew that passenger cruises in the U.S. would be canceled until the C.D.C.'s No Sail Order is lifted, eventually.

31.     Nonetheless, after 64 days since the C.D.C. issued the first no-sail order back on March 14th, the *Millennium* holds nearly 1000 Filipino crew members on board. Upon information and belief, there are at least 1700 Filipino seafarers being held captive throughout CELEBRITY's fleet, and nearly 7,000 between those employed by Royal Caribbean Cruise Line, Azamara Cruise Line, Celebrity Cruise Line, and the other minor subsidiary brands owned by the Royal Caribbean/Celebrity holding entity.

32.     The ship departed Ensenada 8 days later on March 19, 2020. Before leaving Ensenada, some crewmembers were allowed to disembark and sign-off. Many of the Filipino seafarers sought leave to sign off the ship at that point, but were denied permission due to the "lack of a replacement."

33.     The ship finally arrived at San Diego on March 20, 2020, which is also where it is currently located and his been at all times material other than a brief trip for provisions in late March.

34.     Upon information and belief, will remain there until the CDC rescinds its no-sail order as the vessel is scheduled to sail on Alaskan and Pacific Northwest itineraries in the second half of 2020.

35.     Defendant's failure to repatriate its Filipino seafarers unfortunately is not the extent of its unscrupulous conduct. In addition to holding its crewmembers hostage,

against their will, and with little or no payment of wages, the Defendant has engaged in a campaign of disinformation and deception in an effort to avoid mutiny or rebellion on board.

36.     Plaintiff MAGLANA was held without wages since his contract was terminated by Defendant on March 30th. He was advised when he was terminated that he would be repatriated on April 1, 2020, in accordance with the terms of the Collective Bargaining Agreement that Defendant negotiated with the Italian labor union it requires all its employees to join.

37.     Plaintiff BUGAYONG was held without wages since his contract was terminated by Defendant on March 30th. He was also advised when he was terminated that he would be repatriated on April 1, 2020, in accordance with the terms of the Collective Bargaining Agreement (hereinafter "CBA") referenced in paragraph 36 above.

38.     Nonetheless, and despite the unequivocal right of seafarers to be paid for their time on board Defendant's vessels under both U.S. law and the CBA, CELEBRITY failed to pay its Filipino employees, including Plaintiffs, at various times after the March 14, 2020 no-sail order.

39.     Defendant had an absolute obligation to pay Plaintiffs their wages until they were repatriated but despite its obligations under the terms of the CBA by which it is contractually bound, in addition to U.S. law and International law (Maritime Labor

Convention of 2006 which is ratified by Malta[4], the flag state of all Defendant's non-expedition class cruise vessels).

40.     Defendant held, and continues to hold, thousands of souls captive aboard its fleet, including the Plaintiffs, for months without wages or the ability to disembark the ship and return home, for no justifiable reason. Although the dates they were last paid varies across the class, they have all been held for weeks, and even months, without pay or a ticket home.

41.     Plaintiffs MAGLANA and BUGAYONG were told their April 2st flight had been rescheduled to April 8h, then the 16th, and 26th, 28th, and the 11th/12th May tentatively, so on and so forth. Not surprisingly, these too were all canceled.

42.     But why would the cruise lines, and specifically Defendant delay repatriation of its crew? The answer, as is usually the case with the cruise industry, comes down to dollars and cents: profits are far more important than a replaceable crewmember and if someone doesn't like it, there's an eager replacement that will gladly accept an offer to work on a ship that would pay them over $1200 a month for 75 hours of work per work week as an average for 6-9 months.

43.     As has been the case since at least April 23rd, the CDC has not only allowed cruise line crew repatriations from seaports in the U.S., they have provided the cruise lines with a detailed protocol of how to do it to avoid and legal consequences:

---

[4] List of countries that have ratified amendments of 2016 to the MLC, 2006 https://www.ilo.org/dyn/normlex/en/f?p=1000:11301:::NO:RP,11301:P11301_INSTRUMENT_AMENDMENT_ID,P11301_INSTRUMENT_ID:3303970,312331

Delgado Trial Attorneys • 10631 N. Kendall Drive, Suite 130 • Miami, FL 33176
O: (305) 596-7911 • C: (305) 927-3678 • Toll Free (877) 372-0817 • F: (305) 397-2654
www.CruiseLawyerMiami.com

**CDC is allowing crew members to disembark from cruise ships in U.S. waters and return home if cruise lines submit a signed attestation stating that they have complied with requirements to safely disembark their crew members. . .** CDC shared information with all cruise lines in US waters on April 23, 2020, to help crew members return home safely. [5]

44.      The CDC's position on repatriation was public knowledge shortly after the agency published the conditions on its website and providing them to national media. As was the basis for the cruise lines' decision to delay repatriation as long as possible because of the associated costs to repatriate their replaceable crew members that did not fall in line with the company's take it or leave it offer.

45.      Knowing the consequences that would arise due to its unjustified wholesale breach of the CBA and violations of international and U.S. law, CELEBRITY maintained its unlawful conduct and rather than admit the error of its ways, concocted a narrative that claimed that the repatriations were being prevented by the CDC as if they actually believed the rouse would work.

46.      Whether because it was oblivious or intentionally deceiving its crew, the fabricated narrative was soon exposed when the CDC revealed that ships in the US or within its territorial waters had been given the green-light to repatriate the crewmembers in their fleets so long as Defendant agreed to abide by precautionary compliance measures that were non-negotiable due to the history of the cruise lines in making big promises with little to show for it.

---

[5] CDC Guidelines for Disembarkation of Crew published on April 23, 2020. https://www.cdc.gov/coronavirus/2019-ncov/travelers/cruise-ship/cruise-ship-member-disembarkations.html

47.     As recently as May 1st, on board ships in the Royal Caribbean fleet, within the same cruise conglomerate, audio records capture the corporate deception straight from the mouth of their vessel masters, including onboard  the *Oasis*, *Anthem* and *Symphony of the Seas*. After local media published a story which revealed the extent of the rouse, ship captains shamelessly denied the stories and instead, continued to fabricate tall tales.

48.     In fact, according to the Master of the *Oasis of the Seas* "'[i]n regards to what was in the Miami Herald the other day [about economics being the cause of the delay, not the CDC], well, that is one of those things that is not true at all,' said the captain [ ] in an announcement Friday." Similarly, according to the Master of the *Symphony of the Seas* "'[f]irst of all, I'd like to just address the Miami Herald article that came out yesterday," said the captain on the Symphony of the Seas. He joked that the only way to comply with the CDC guidelines is for American crew to walk home, citing a requirement that crew not interact with the public on their journey home.'"

49.     Most damning of all though, was the commentary of the Master of the *Anthem of the Seas* who shamelessly lied to the crew and stated:

 'There was one article today *we* all read and we raised that question today in a conference call which says that CDC and cruise lines did not come with an agreement because it's too expensive,' said the captain on the Anthem of the Seas Friday. 'That is absolute false. The money has nothing to do with it. It is absolutely not the money that we are concerned. The money is not the issue.'"[6]

---

[6] Miami Herald article "Royal Caribbean false blames CDC for keeping crew trapped on its ships, agency says" dated May 1, 2020
https://www.miamiherald.com/news/business/tourism-cruises/article242443236.html

50.     In reality though, subsequent statements of the company's corporate officers show beyond a doubt that the company was intentionally lying to crew. Days after the May 1st report of the Masters' fabrications and misrepresentations, RCCL CEO went on record and stated "he hopes the threat of criminal prosecution will be removed. . . 'we have decided that the importance of getting [crew] home is so great that we will sign these documents as they are written today to help get you off the ships.'"[7]

51.     Since those May 3rd promises were memorialized in print, over two weeks have come and gone, yet thousands of crew members remain captive on board the ships they previously served on, with no wages, and growing more desperate by the day.



52.     There have been hunger strikes on the *Navigator of the Seas* "[a]t this

---

[7] Miami Herald article " Royal Caribbean executives agree to the CDC's terms for disembarking crew stuck on ships" dated May 3, 2020 https://www.miamiherald.com/news/business/tourism-cruises/article242471226.html

DELGADO TRIAL ATTORNEYS • 10631 N. KENDALL DRIVE, SUITE 130 • MIAMI, FL 33176
O: (305) 596-7911 • C: (305) 927-3678 • TOLL FREE (877) 372-0817 • F: (305) 397-2654
www.CruiseLawyerMiami.com

moment, we feel that we're all hostages,' said one crew member, who asked not to be named for fear the company will retaliate and delay repatriation. 'This company needs to understand we are not boxes of food that can be moved around.'"; heart wrenching cries for help and multiple suicides. [8]

53.     Without a doubt, we are witnessing a human rights tragedy of immense proportions unfold before our very eyes. But unlike in the past, Defendant CELEBRITY and its colleagues in the cruise ship cartel cannot hide behind the lawless open oceans where many of their misdeeds are typically swept away with the current.

54.     This time tough, CELEBRITY's unscrupulous, discriminatory and illegal actions are not transpiring on the open ocean thousands of leagues from the nearest point of land. This time, the world is watching, the nation is watching, and a failure to act and fight for what is right will not go unnoticed. **We are all witnesses.**

<u>CLASS ACTION ALLEGATIONS</u>

55.     At all times material hereto, Plaintiffs, the Class Representatives and Class Members herein, are and/or were crewmembers who worked for Defendant aboard Defendant's vessels and who are Filipino nationals.

56.     This action is brought by Plaintiffs MAGLANA and BUGAYONG on their own behalf, and pursuant to Fed. R. Civ. P. 23(b)(1-3) they seek to represent a worldwide class consisting of:

---

[8]Miami Herald article " Royal Caribbean crew go on hunger strike until company proves it is sending them home" dated May 8, 2020
 https://www.miamiherald.com/news/business/tourism-cruises/article242595896.html

DELGADO TRIAL ATTORNEYS • 10631 N. KENDALL DRIVE, SUITE 130 • MIAMI, FL 33176
O: (305) 596-7911 • C: (305) 927-3678 • TOLL FREE (877) 372-0817 • F: (305) 397-2654
www.CruiseLawyerMiami.com

All other similarly situated Filipino crewmembers who worked aboard Defendant's cruise vessels who remain captive aboard vessels in Defendant's fleet, and are being subjected to the dangerous conditions outlined above in connection with Defendant's callous and unreasonable failure to repatriate its crewmembers upon its unilateral decision to terminate their contracts and entitlement to wages.

57.     Plaintiff reserves the right to seek to represent sub-classes of the world-wide class.

58.     *Numerosity*– The exact number of members of the class is unknown at this time given that many members are currently in voluntary or forced isolation aboard Defendant's vessels; however, at this time it is estimated that there are in excess of over 1700 members. The class is so numerous that joinder would be impracticable. Thus, this action satisfies the requirements of Rule 23(a)(1).

59.     *Commonality* — There are common questions of law and fact that relate to and effect the rights of each member of the class and the relief sought is common to the entire class. The same misconduct on the part of Defendant, CELEBRTIY, caused the same or similar injury to each class member. All members of the class are or were 1) employees of the Defendant at all material times; 2) who are Filipino nationals 3) which were required to sign the same employment agreements that required their membership in the 4) same union which Defendant purportedly collectively bargained with. All class members were entitled to the rights of wages or repatriation under US law, Maltese law, International law, and the CBA agreement.   All class members seek damages and equitable relief in the form of a mandatory injunction as described in ¶¶ 1, 4, and 6 above and accordingly, this action satisfies the requirement of Rule 23(a)(2).

DELGADO TRIAL ATTORNEYS • 10631 N. KENDALL DRIVE, SUITE 130 • MIAMI, FL 33176
O: (305) 596-7911 • C: (305) 927-3678 • TOLL FREE (877) 372-0817 • F: (305) 397-2654
WWW.CRUISELAWYERMIAMI.COM

60.     *Typicality*-- The claims of Plaintiffs are typical of the claims of the class, in that the claims of all members of the class, including the named Plaintiff, depend upon a virtually identical showing of the acts and omissions of Defendant, CELEBRITY, giving rise to the right of Plaintiff to the relief sought herein. Defendant, CELEBRITY, was at all times material hereto engaged in the same conduct to the detriment of the entire class of Plaintiffs. Accordingly, this action satisfies the requirements of Rule 23(a)(3).

61.     *Adequacy of Representation* – Plaintiff is the representative party for the class, and is able to, and will, fairly and adequately protect the interests of the class. Plaintiffs MAGLANA and BUGAYONG are adequate representatives of the class because: (1) they are willing and able to represent the proposed class and have every incentive to pursue this action to a successful conclusion; (2) their interests are not in any way antagonistic to those of the other class members; and (3) are represented by counsel experienced in litigating claims under the General Maritime Law of the United States in addition to the statutory modifications and amendments enacted by Congress. Accordingly, this action satisfies the requirement of Rule 23(a)(4).

62.     *Propriety of Maintenance of Class Action under Fed. R. Civ. P. 23(b)(1).* Class action status is appropriate under Fed. R. Civ. P. 23(b)(1) because in light of the number of Filipino employees that are currently being held against their will by Defendant, adjudication of Plaintiffs prayers for a mandatory injunction would be dispositive of the their legal right to be repatriated in accordance with U.S. and International maritime law.

**Delgado Trial Attorneys • 10631 N. Kendall Drive, Suite 130 • Miami, FL 33176**
**O: (305) 596-7911 • C: (305) 927-3678 • Toll Free (877) 372-0817 • F: (305) 397-2654**
www.CruiseLawyerMiami.com

63. *Propriety of Maintenance of Class Action under Fed. R. Civ. P. 23(b)(2).* Class action status is appropriate under Fed. R. Civ. P. 23(b)(2) because CELEBRITY has acted and/or refused to act on grounds generally applicable to the class, thereby making final injunctive relief appropriate. Such generally applicable grounds consist of the repatriation of its shipboard employees to their country of residence, the Philippines, in accordance with U.S. and International Maritime law and wages for the time they served aboard the vessel. **This relief would predominate over monetary relief.**

64. *Propriety of Maintenance of Class Action under Fed. R. Civ. P. 23(b)(3).* This action is properly maintained as a class action under Rule 23(b)(3) inasmuch as questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy. In support of the foregoing, Plaintiffs allege that common issues predominate and can be determined on a class-wide basis regarding Defendant, CELEBRITY's violation of Plaintiffs rights to be paid wages or repatriated after their contracts end due to Defendant's unilateral decision to terminate their contracts. Moreover, the ships they served on became unseaworthy, and in view of Defendant's callous disregard for the wellbeing of the Plaintiffs who were prevented from disembarking Defendant's ships.

65. Moreover, as noted above in paragraphs 15-17, Plaintiffs have historically been considered to be a class of individuals that is so particularly vulnerable to abuse and exploitation that they were considered to be the wards the Federal Coruts. In our

Delgado Trial Attorneys • 10631 N. Kendall Drive, Suite 130 • Miami, FL 33176
O: (305) 596-7911 • C: (305) 927-3678 • Toll Free (877) 372-0817 • F: (305) 397-2654
www.CruiseLawyerMiami.com

countries two centuries of legal jurisprudence, those classes of individuals that are labeled by the judiciary as on the lawless expanses of the open oceans that lack any real governmental oversight when beyond the jurisdictional limits of a nation's territorial water

66.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because it is unlikely that individual plaintiffs would assume the burden and the cost of this complex litigation, and Plaintiff is not aware of any class members who are interested in individually controlling the prosecution of a separate action. The interests of justice will be served by resolving the common disputes of the class members with Defendant, CELEBRITY, in a single forum, and individual actions by class members, all of whom are citizens of the Philippines would be cost prohibitive. The class consists of a finite and identifiable number of individuals which will make the matter manageable as a class action.

67.     Plaintiff anticipates Defendant will attempt to evade any type of governmental oversight or public scrutiny by exercising a forced arbitration provision in the CBA. However, Defendant's complete failure to pay Plaintiffs wages for the time they were onboard its vessels or alternatively, repatriate them home is a material and complete breach of the essence of the CBA which governs the Plaintiffs employment with Defendant in exchange for their wages. Accordingly, Defendants lack a legal basis for compelling a contractual right which is part of a larger agreement that Defendant has materially breached.

Delgado Trial Attorneys • 10631 N. Kendall Drive, Suite 130 • Miami, FL 33176
O: (305) 596-7911 • C: (305) 927-3678 • Toll Free (877) 372-0817 • F: (305) 397-2654
www.CruiseLawyerMiami.com

68.     In addition, no arbitration provision in any of the Plaintiffs' employment contracts and/or CBAs with CELEBRITY expressly call for arbitration of class action employment-related claims, nor contemplate claims for equitable relief and mandatory injunctions.

69.     Aggrieved parties cannot be forced to submit class action disputes to arbitration unless there is a contractual basis for concluding that the aggrieved parties agreed to do so. *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684-87 (2010) ("[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so . . . An implicit agreement to authorize class-action arbitration, however, is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate. . . class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator.") (emphasis in original).

70.     Accordingly, Plaintiffs' Class Action lawsuit filed in this Court is proper. *See id.*

## EXHASUTION OF ADMINSTRATIVE REMEDIES

71.     As referenced above, Plaintiffs have not received the Right to Sue notice from the EEOC at this time because the agency has issued a moratorium on them until further notice when the virus's impact on the ability to resume normal operations is better known. Plaintiff's EEOC Charge Filing No. is 510-2020-03917

## COUNT I

MAGLANA V. CELEBRITY CRUISE INC.
CASE NO.: 1:20-cv-22133-JEM

### PRELIMINARY MANDATORY INJUNCTION REQUIRING REPATRIATION OF DEFENDANT'S FILIPPINO CREWMEMBERS
### [*CLASS & INDIVIDUAL CLAIM*]

72.     PLAINTIFFS restate and reallege the allegations contained in paragraphs 1 through 47 above as if fully set forth herein.

73.     PLAINTIFFS and members of the class are employees of Defendant CELEBRITY within the meaning of 42 U.S.C. § 2000(e) *et seq.,* and Fed. R. Civ. P. 23. In the alternative, should the Court determine that PLAINTIFFS are precluded from seeking relief under Title VII, PLAINTIFFS submit that their class nonetheless satisfies the requirements of Fed. R. Civ. P. 23 regardless of Title VII as their class nonetheless comports with the prescriptions of Fed. R. Civ. P. 23(a) and (b)(1-3).

74.     CELEBRITY has adopted and/or maintained subjective employment practices, including but not limited to, subjective and disparate practices for complying with their legal obligations to repatriate employees that are not earning wages based exclusively on their national origins because, on information and belief, the larger the number of individuals from a specific national original, the higher the cost for Defendant to comply with its obligations under maritime law to repatriate its crew, and accordingly, continue to "schedule" repatriation trips on a nearly weekly basis, all of which have been "canceled" due to the fabricated narrative that the CDC is prohibiting repatriation.

75.     PLAINTIFFS will suffer irreparable harm if Defendant continues to perpetually delay its obligations under International maritime law (IMO procedures relating to the Maritime Labor Convention) and U.S. General Maritime law which the U.S. Coast Guard has determined to be consistent with U.S. General Maritime law and

DELGADO TRIAL ATTORNEYS • 10631 N. KENDALL DRIVE, SUITE 130 • MIAMI, FL 33176
O: (305) 596-7911 • C: (305) 927-3678 • TOLL FREE (877) 372-0817 • F: (305) 397-2654
www.CruiseLawyerMiami.com

requires ships flying a U.S. flag to comply with "NVIC 02-13 uses a Statement of Voluntary Compliance (SOVC) and a Declaration of Voluntary Compliance to mirror the MLC and the DMLC of the MLC, 2006. The U.S. Coast Guard was extremely meticulous in following the letter of the MLC, 2006 for one principal reason: the 'no more favourable (sic) treatment' clause contained in Article V, paragraph 7 [of the Maritime Labor Convention of 2006]. See U.S. Coast Guard's Circular dated January 6, 2017 implementing the MLC's Repatriation requirements [D.E. 1-1].

76.     Specifically, PLAINTIFFS have been, and continue to be, irreparably harmed by CELEBRITY's failure to repatriate them which includes, but is not limited to:

a) mental anguish and emotional distress caused by the discriminatory treatment they have suffered on the basis of their national origins;

b) multiple suicides;

c) inability to provide for dependents, including children and parents;

d) continued potential exposure to the COVID-19 causing coronavirus which has infected well over five million people across the world and killed over 300 thousand; and

e) inability to earn wages from an alternative source of employment in light of CELEBRITY's decision to terminate their contracts.

77.     PLAINTIFFS have no adequate remedy of law that would serve to immediately enjoin Defendants continued and unlawful violation of PLAINTIFFS' basic human rights and their rights to earn wages or be repatriated to care for their loves ones and dependents.

78.     PLAINTIFFS have a substantial likelihood of success on the merits on its claims for false imprisonment and discrimination under Title VII of the U.S. Code which

provides for damages for emotional distress in addition to the damages that are customarily seen in actions for tort under the General Maritime law of the United States.

79.    The entry of a preliminary injunction will serve the public interest by effectuating the important policy concerns of Title VII preventing workplace discrimination on the basis of national origin, amongst others, in addition to reinforcing Defendant's apparent inability or unwillingness to comprehend that no person or corporation is above the law.

80.    PLAINTIFFS have a clear legal right to the relief sought herein.

**WHEREFORE**, PLAINTIFFS pray that:

1)    The Court maintains this matter as a class action on behalf of the proposed worldwide class, that Plaintiffs be designated as representatives of the class and that their counsel of record be designated as Class Counsel;

2)    That the Court enter an injunction against Defendant CELEBRITY Ordering it to repatriate its Filipino seafarers that are not actively being paid wages, and are being held against their will aboard ships in CELEBRITY's fleet;

3)    That the Court Order Defendant to submit an accounting to the Court of the wages since the CDC's March 14, 2020 No-Sail Order for Plaintiffs individually and on behalf of all similarly situated Filipino seafarers held and or still being held against their will by Defendant CELEBRITY onboard vessels in its fleet;

4)    That judgement be entered in favor of Plaintiffs and the members of the class set forth herein, and against Defendant, for back pay (including interest or an appropriate inflation factor), front pay, benefits and all other amounts owed to Plaintiffs and the members of the class;

5)    That the Plaintiffs be awarded costs, including but not limited to, attorneys' fees, experts' fees, and other costs and expenses of this

**Delgado Trial Attorneys • 10631 N. Kendall Drive, Suite 130 • Miami, FL 33176**
**O: (305) 596-7911 • C: (305) 927-3678 • Toll Free (877) 372-0817 • F: (305) 397-2654**
**www.CruiseLawyerMiami.com**

litigation, and pray for such other relief in equity which this Court deems just and proper.

6)    That the Court retain jurisdiction over Defendant until such time as it is satisfied that it has remedied the practices complained of and it determined to be in full compliance with the law.

## COUNT II
## INTENTIONAL TORT OF FALSE IMPRISONMENT
### [CLASS & INDIVIDUAL CLAIM]

81.    PLAINTIFFS restate and reallege the allegations contained in paragraphs 1 through 47 above as if fully set forth herein.

82.    At all times material Defendant CELEBRITY intentionally caused the Plaintiffs to be **held captive** against their will with **no wages or ability to leave the ship** due to Defendant's election to ignore and violate their legal obligations under the laws of this country, International law and the Maritime Labor Convention of 2006 and its amendments.

83.    The restraint of the Filipino seafarer PLAINTIFFS as a class, and PLAINTFFS MAGLANA and BUGAYONG as Class Representatives and/or individually, was done against PLAINTIFFS' collective will through acts directly and in a natural and continuous sequence to produce or contribute substantially to producing the unjustified and intentional restraint of the class as a whole, so that it can be reasonably said that, but for those acts of CELEBRITY, the seemingly perpetual restraint/imprisonment would not have occurred, by confining the Plaintiffs to a perpetual confinement on its ships for reasons unknown to Plaintiffs but clearly in violation on US and International law.

Delgado Trial Attorneys • 10631 N. Kendall Drive, Suite 130 • Miami, FL 33176
O: (305) 596-7911 • C: (305) 927-3678 • Toll Free (877) 372-0817 • F: (305) 397-2654
www.CruiseLawyerMiami.com

84.    As a result of the Defendant CELEBRITY's false imprisonment of the Plaintiffs, they were physically and emotionally injured about their bodies and extremities, suffered physical pain, mental anguish, loss of enjoyment of life, disability, disfigurement, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of plaintiffs injuries, suffered physical handicap, lost wages and their working ability has been impaired in the future. The injuries are permanent or continuing in nature, and Plaintiff will suffer the losses and impairments in the future. In addition, plaintiff lost the benefit of plaintiffs vacation, cruise, and transportation costs.

**Wherefore**, the plaintiffs demands judgment for all damages recoverable under the law against the Defendant CELEBRITY, including compensatory damages, costs, including attorneys' fees and experts' fees, punitive damages based on the intentional nature of CELEBRITY's conduct to the maximum extent allowed under the law, and demands trial by jury, and for any other relief the Court dete4rmines reasonable and just.

**COUNT III**
**EMPLOYMENT DISCRIMINATION ON THE BASIS OF NATIONAL ORIGIN**
*[CLASS & INDIVIDUAL CLAIM]*

85.    PLAINTIFFS restate and reallege the allegations contained in above Paragraphs 1 through 47 of this Complaint as though set forth here in full.

86.    Plaintiffs and members of the class are employees of CELEBRITY within the meaning of 42 U.S.C. § 2000(e) *et seq.*

**Delgado Trial Attorneys • 10631 N. Kendall Drive, Suite 130 • Miami, FL 33176**
**O: (305) 596-7911 • C: (305) 927-3678 • Toll Free (877) 372-0817 • F: (305) 397-2654**
**www.CruiseLawyerMiami.com**

87.     The discriminatory policies or practices of CELEBRITY, as set forth in this Complaint, have denied Plaintiffs and members of the class their right to equal employment opportunity in violation of 42 U.S.C. § 2000(e) *et seq.*

88.     CELEBRITY has adopted and/or maintained a system-wide policy or practice of discrimination by, among other things, denying Plaintiffs and members of the class equal opportunities as described above.

89.     CELEBRITY has adopted and/or maintained subjective employment practices, including but not limited to, subjective and disparate practices repatriating employees based exclusively on their national origin. Through the apparent use of a "cost/benefit analysis" type approach of comparing potential costs of repatriation versus keep employees on board until the no-sail orders are lift later this year, to hell with their needs.

90.     The embodiment of the "profits over people" concept implemented by CELEBRITY to intentionally withhold its employees' wages and simultaneously deprive them of their ability to return home and reunite with loved ones.

91.     Sadly, CELEBRITY determines the ability of their crew to return home and be freed from their illegal captivity is based entirely on their national origin.

92.     This is clear evidence of their belief that they can act with impunity because of the legal gymnastics they play with their principal place of business and Headquarters. in Miami, claims of Liberian citizenship, and operating vessels that fly under the flag of Malta.

DELGADO TRIAL ATTORNEYS • 10631 N. KENDALL DRIVE, SUITE 130 • MIAMI, FL 33176
O: (305) 596-7911 • C: (305) 927-3678 • TOLL FREE (877) 372-0817 • F: (305) 397-2654
WWW.CRUISELAWYERMIAMI.COM

MAGLANA V. CELEBRITY CRUISE INC.
CASE NO.: 1:20-cv-22133-JEM

93.     By reason of CELEBRITY's discriminatory policies or practices as set forth in this Complaint, Plaintiff and members of the class have suffered damages including, but not limited to, lost income, lost benefits, embarrassment, emotional distress, physical injury, humiliation, indignity and a reduced quality of life, since the discrimination began and into the future.

**WHEREFORE**, the plaintiffs demand judgment for all damages recoverable under the law against the Defendant CELEBRITY, including compensatory damages, injunctive/equitable relief prayed for in Count II, their costs, including attorneys' fees and experts' fees, punitive damages based on the intentional nature of CELEBRITY's conduct to the maximum extent allowed under the law, and for any other relief the Court determines reasonable and just.

## COUNT IV
## WAGES AND PENALTIES PURSUANT TO 46 U.S.C. § 10313
### [*CLASS & INDIVIDUAL CLAIM*]

94.     Plaintiffs re-allege, incorporate by reference, and adopt paragraphs 1 47 above as though originally alleged herein.

95.     At all times material hereto, Plaintiffs were employed as seamen in the service of the vessel.

96.     While in the service of the ship, Plaintiffs performed all the work required of them, and carried out the orders given by their superiors.

97.     Plaintiffs were discharged without any just or sufficient cause. At the time of Plaintiffs' discharge, the vessel was, and remains in, a port of the United States.

98.     At the time of Plaintiffs discharge, Defendant did not pay Plaintiff all

º 27 º

of their earned wages, including reimbursement of deductions previously made of Plaintiffs' wages. Defendant has sole custody and control of Plaintiffs wage records and personnel files. These documents are needed by Plaintiff to review to show exact dates and amounts with respect to earned wages owing to Plaintiff and deductions made from such earned wages and reflect the equitable accounting prayed for in Count I above.

99.     At the time of Plaintiffs' discharge, Plaintiff demanded all their wages, including reimbursement of deductions made from Plaintiff s earned wages.

100.    Defendant refused to pay Plaintiffs all their earned wages or reimburse Plaintiffs for the deductions made there from, without sufficient cause.

101.    Under 46 U.S.C.A. Section 10313, Plaintiff is entitled to his earned wages, deductions, and two days wages for each day payment is delayed.

WHEREFORE, Plaintiff demands all damages entitled to by law, attorney's fees, prejudgment and post-judgment interest, costs and demands jury trial of all issues so triable.

## COUNT V
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### [*CLASS & INDIVIDUAL CLAIM*]

102.    Plaintiffs re-allege, incorporate by reference, and adopt paragraphs 1 through 47 above as though originally alleged herein.

103.    At all times material hereto, Plaintiffs were held onboard the ship's in Defendant CELEBRITY's fleet unlawfully and without just cause, perpetually, without wages or ability to escape their captors who were holding them under draconian rules

º 28 º

designed to intimidate and discourage crew members from leaking information to the media and legal counsel from the confines of the ship. Not surprisingly, the company was concerned that it was hurting the company's public image during a time where it was already sensitive to public attention to its involvement in facilitating the spread of the pandemic.

104. CELEBRITY'S conduct was intentional or reckless, that is, it intended its behavior when it knew or should have known that emotional distress would likely result.

105. The conduct was outrageous, that is, as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community insofar as human beings are being treated more like cattle than people and being transferred from ship[ to ship, into perpetuity, while continually exposed to the pandemic. Accordingly, the emotional distress they are and have suffered was severe.

106. Plaintiffs have and will continue to suffer emotion distress and mental anguish as a result of Defendant's intentionally callous conduct which was so severe as to cause Plaintiffs' mental anguish.

**WHEREFORE**, the plaintiffs demand judgment for all damages recoverable under the law against the Defendant CELEBRITY, including compensatory damages, injunctive/equitable relief prayed for in Count II, their costs, including attorneys' fees and experts' fees, punitive damages based on the intentional nature of CELEBRITY's conduct to the maximum extent allowed under the law, and for any other relief the Court determines reasonable and just.

º 29 º

Delgado Trial Attorneys • 10631 N. Kendall Drive, Suite 130 • Miami, FL 33176
O: (305) 596-7911 • C: (305) 927-3678 • Toll Free (877) 372-0817 • F: (305) 397-2654
www.CruiseLawyerMiami.com

MAGLANA V. CELEBRITY CRUISE INC.
CASE NO.: 1:20-cv-22133-JEM

Respectfully submitted this on this 20th day of June, 2020.

BY: _____

RAUL G. DELGADO II, ESQ.
Florida Bar No. 094004
raul@cruiselawyermiami.com
Raulsr@cruiselawyermiami.com
heidi@cruiselawyermiami.com
filing@cruiselawyermiami.com
DELGADO TRIAL ATTORNEYS
*Attorneys for Plaintiff*
10631 N. Kendall Drive, Suite 130
Miami, FL 33176
Ph:              (305) 596-7911
Cell:            (305) 972-0817
Fax:             (305) 397-2654
Toll Free:       1(877) 372-0817

DELGADO TRIAL ATTORNEYS • 10631 N. KENDALL DRIVE, SUITE 130 • MIAMI, FL 33176
O: (305) 596-7911 • C: (305) 927-3678 • TOLL FREE (877) 372-0817 • F: (305) 397-2654
WWW.CRUISELAWYERMIAMI.COM

MAGLANA V. CELEBRITY CRUISE INC.
CASE NO.: 1:20-cv-22133-JEM

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 20th, 2020 I electronically filed this document using the Court's CM/ECF system, and the Service List below, which will automatically serve a copy on all counsel of record.

BY: _____

RAUL G. DELGADO II, ESQ.
Florida Bar No. 094004
raul@cruiselawyermiami.com
Raulsr@cruiselawyermiami.com
heidi@cruiselawyermiami.com
filing@cruiselawyermiami.com
DELGADO TRIAL ATTORNEYS
*Attorneys for Plaintiff*
10631 N. Kendall Drive, Suite 130
Miami, FL 33176
Ph:              (305) 596-7911
Cell:            (305) 972-0817
Fax:             (305) 397-2654
Toll Free:       1(877) 372-0817

## SERVICE LIST

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-22133-CIV-MARTINEZ

**Plaintiffs RYAN MAUNES MAGLANA and FRANCIS KARL BUGAYONG,** *on their own behalf and as class representatives for all other similarly situated Filipino crewmembers trapped aboard* **CELEBRITY** *cruise vessels,*

**v.**

### Defendant, CELEBRITY CRUISES INC.

| | |
|---|---|
| **Raul G. Delgado II, Esq.**<br>Florida Bar No. 094004<br>raul@cruiselawyermiami.com<br>heidi@cruiselawyermiami.com<br>filing@cruiselawyermiami.com<br>**Raul G. Delgado, Esq.**<br>Florida Bar No. 236969<br>raulsr@cruiselawyermiami.com<br>**DELGADO TRIAL ATTORNEYS**<br>*Attorneys for Plaintiff*<br>10631 N. Kendall Drive, Suite 130<br>Miami, Florida 33176<br>Telephone:  (305) 596-7911<br>Facsimile:    (305) 397-2654<br>Toll free:  1 (877)372-0817 | HOLLAND & KNIGHT LLP<br>701 Brickell Avenue, Suite 3300<br>Miami, Florida 33131<br>(305) 374-8500 (telephone)<br>(305) 789-7799 (facsimile)<br>By: /s/ Scott D. Ponce<br>Sanford L. Bohrer (FBN 160643)<br>sbohrer@hklaw.com<br>Alex M. Gonzalez (FBN 0991200)<br>alex.gonzalez@hklaw.com<br>Scott D. Ponce (FBN 0169528)<br>sponce@hklaw.com |
| | HAMILTON, MILLER, & BIRTHISEL LLP<br>Jerry D. Hamilton (FBN 970700)<br>jhamilton@hamiltonmillerlaw.com<br>Evan S. Gutwein (FBN 58741)<br>egutwein@hamiltonmillerlaw.com<br>Annalisa Gutierrez (FBN 97940)<br>agutierrez@hamiltonmillerlaw.com<br>150 S.E. Second Avenue, Suite 1200<br>Miami, Florida 33131<br>(305) 379-3686 (telephone)<br>(305) 279-3690 (facsimile)<br>Attorneys for Defendant |