UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-22133-CIV-MARTINEZ

RYAN MAUNES MAGLANA and
FRANCES KARL BUGAYONG,
on behalf of themselves and all others
similarly situated,

    Plaintiff,

vs.

CELEBRITY CRUISES INC.

    Defendant.
_____/

**DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT**

Defendant Celebrity Cruises Inc. ("Celebrity"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, moves for the entry of an Order dismissing with prejudice Counts II and V of the amended complaint [DE 19], which are the only counts of the amended complaint that remain at issue in this action. The grounds for this motion are:

### I.    INTRODUCTION

**A.    Plaintiffs' Claims Have Been Substantially Reduced.**

The claims asserted in the amended complaint have been greatly reduced both in number and scope. This Court compelled arbitration of the five claims that are pleaded in the amended complaint. DE 46. Plaintiff appealed *only* to the extent that the Court compelled arbitration of the claims for "intentional tort of false imprisonment" (Count II) and "intentional infliction of emotional distress" (Count V). *See Maglana v. Celebrity Cruises Inc.*, 2022 WL 3134373, at *3 (11th Cir. Aug. 5, 2022) ("Maglana and Bugayong appeal the order compelling arbitration of the two intentional tort claims."). Thus, the claims for "preliminary mandatory injunction" (Count I),

employment discrimination (Count III), and unpaid wages and penalty wages (Count IV) *are no longer part of this action*.

That leaves only the purported claims for false imprisonment (Count II) and intentional infliction of emotional distress (IIED) (Count V). In order to manufacture appellate issues, Plaintiffs narrowed those claims on appeal by "stipulat[ing] in oral argument that their tort claims are limited to Celebrity's actions that took place after their termination." *Id.* at *5 n.5. Thus, instead of what is alleged in the amended complaint, the claims for false imprisonment and IIED that were remanded to this Court are now limited to "the 58 days that [Plaintiffs] were confined on the *Millennium* from March 31 to May 26, 2020." *Id.* at **1, 5. That is the period of time between (a) the day after Plaintiffs were fired for theft, and (b) the date on which the circumstances of the COVID-19 pandemic and global quarantine, and the United States Government's changing regulations, permitted Plaintiffs to leave the ship and travel to The Philippines.

Those claims – for intentional false imprisonment and IIED – should be dismissed with prejudice because they fail to state a claim. The claim for false imprisonment fails because Plaintiffs' alleged detention was neither unlawful nor without legal authority, and was reasonable under the circumstances. The IIED claim fails for the same reasons and because it is well settled that being exposed to illness does not give rise to a claim for IIED.

**B.      The Allegations Of The Amended Complaint.**

This case arises from scariest part of the COVID-19 pandemic – its onset. The strain of the virus that was circulating was the most virulent and deadly strain. There was no vaccine. Johns Hopkins was tracking worldwide deaths in the hundreds of thousands. The world shut down in an ultimately unsuccessful attempt to slow the virus's spread and, particularly important here, the governments of the world closed their countries' borders and locked down international travel.

The U.S. Centers for Disease Control (CDC) issued a No Sail Order on March 14, 2020. Am. Compl., ¶29; *see also* 85 Fed. Reg. 16628 (March 24, 2020) ("This action was effective March 14, 2020."). The No Sail Order shut down cruise ship operations at U.S. ports and effectively prevented foreign crew members from leaving ships that were docked at U.S. ports and entering the country.

Plaintiffs were working aboard *Millennium*, which is a cruise ship operated by Celebrity, when the No Sail Order was issued. Am. Compl., ¶¶2-3. Plaintiffs are citizens of The Philippines. *Id.* The ship was docked in San Diego, California beginning on March 20, 2020. *Id.* at ¶33.

Plaintiffs were fired by Celebrity on March 30, 2020 because Plaintiffs stole an expensive bottle of liquor from the ship. *Id.* at ¶¶36-37; *see also Maglana*, 2022 WL 3134373, at *1. In accordance with the terms of the applicable collective bargaining agreement, Plaintiffs would normally have been immediately repatriated – at Plaintiffs' expense – to The Philippines from California. Am. Compl. at ¶¶36-37; *see also Maglana*, 2022 WL 3134373, at *1. However, these were not normal times because the No Sail Order made it impossible for Plaintiffs to leave the ship and enter the U.S. in order to travel to The Philippines. Tellingly, Plaintiffs do not (and, indeed, cannot) allege otherwise in the amended complaint. Thus, as of March 31, 2020 – which is the first day of the 58-day period over which Plaintiffs are suing – United States law prohibited Plaintiffs from leaving the ship.

On April 23, 2020 – 23 days into the 58-day period over which Plaintiffs are suing – the CDC first announced that crew members on ships docked at United States ports could disembark their vessels and enter the U.S. in order to return home "'*if* cruise lines submit a signed attestation stating that they have complied with requirements to safely disembark their crew members.'" Am. Compl. at ¶43 & p. 12 n.5 (emphasis added).

3

The attestation was required to be signed by a cruise line's (1) President and Chief Executive Officer; (2) Chief Ethics and/or Compliance Officer; *and* (3) highest-ranking Medical Officer. Those cruise line executives were required to swear – subject to the imposition of personal criminal liability, including imprisonment, as provided in 18 U.S.C. §1001 – that each and every one of the cruise line's thousands of shipboard crew would follow an exhaustive list of rules until each employee reached his or her house or next work-posting, including – most broadly – that each crew member "will have no interaction with the public during their travel home or to their new duty station (e.g., rental car companies, restaurants, other public areas, etc.)." The attestation required by the CDC is attached to this motion as Exhibit 1.[1]

According to the amended complaint, the fact that the executives at Celebrity and its parent corporation, Royal Caribbean Cruises Ltd., would be required to swear – subject to the imposition of personal criminal liability, including imprisonment – that each of the thousands of crew members would abide by the CDC's rules at all times while traveling from the United States to their houses abroad, caused concern and gave "pause" to the executives. Am. Compl. at ¶50 & p.14 n.7. Nonetheless, and in the hope that the threat of criminal prosecution might be removed, Celebrity informed its crew on May 3, 2020, that it would sign the attestation. *Id.*

Getting the foreign crew members off the ships and into the United States was only one-half of the equation for repatriation. The other half of the equation was that – in a time when countries had sealed their borders in order to slow or stop the spread of COVID-19 – the crew members' countries needed to agree to admit people who were coming off a cruise ship. The

---

[1] The Court may consider this document and its terms in connection with this motion to dismiss because the amended complaint expressly refers to the document, the authorities governing Plaintiffs' ability to leave the ship are central to Plaintiffs' claims, and Plaintiffs cannot dispute the authenticity of the document. *See, e.g., Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (citing *Horsley*, 304 F.3d at 1134).

4

amended complaint contains **_absolutely no allegations_** regarding when The Philippines began permitting its citizens to reenter that country after having been aboard cruise ships.

That is important because the CDC would **_not_** permit crew members to get off the ships to hand around and wait in the United States until such time as the crew members' countries would admit them. Instead, the CDC required the crew members to stay on the ships until they could be taken directly to transportation that would take them out of the Unites States and ultimately to their countries. Ex. 1. Under the CDC's rules, crew members were prohibited from staying in a hotel prior to boarding their transportation, prohibited from interacting with the public, and could not have a transportation layover exceeding 8 hours. *Id.*

On May 26, 2020, Plaintiffs and 200 other Filipino citizens aboard the *Millennium* were flown to The Philippines on a charter flight arranged and paid for by Celebrity. DE 10; *see also Maglana*, 2022 WL 3134373, at *2.

Against that backdrop, Plaintiffs allege that Celebrity falsely imprisoned them on the ship following the termination of their employment (Count II) and, in doing so, intentionally inflicted emotional distress upon them (Count V), because it was not until May 26, 2020 that Plaintiffs disembarked the ship in order to travel to The Philippines on a charter flight that was arranged and paid for by Celebrity. Counts II and V should be dismissed with prejudice for failure to state a claim.

## II.     ARGUMENT

**A.     Count II, For Intentional False Imprisonment, Fails To State A Claim.**

Count II of the amended complaint purports to state a claim for intentional false imprisonment. As narrowed on appeal, Plaintiffs allege that Celebrity intentionally and falsely imprisoned them aboard the *Millennium* for the 58 days between (a) March 31, 2020, the day after

5

Plaintiffs' employment was terminated for theft, and (b) May 26, 2020, when Plaintiffs left the vessel and returned to The Philippines aboard a charter flight that was arranged and paid for by Celebrity. Count II should be dismissed with prejudice because it fails to state a claim.

Plaintiffs allege that this claim for the intentional tort of false imprisonment "arise[s] under the General Maritime Law of the United States . . . ." Am. Compl. at ¶7. "General maritime law is 'an amalgam of traditional common-law rules, modifications of those rules, and newly created rules.'" *See Smolnikar v. Royal Caribbean Cruises Ltd.*, 787 F.Supp.2d 1308, 1315 (S.D. Fla. 2011) (quoting *East River Steamship Corp. v. Transamerice Delaval, Inc.*, 476 U.S. 858, 864-65 (1986)). In the absence of well-developed maritime law pertaining to a particular claim, courts incorporate "general common law principles and [] state law to the extent they do not conflict with federal maritime law." *See id.*; *see also Kantrow v. Celebrity Cruises Inc.*, 510 F.Supp.3d 1311, 1317 (S.D. Fla. 2020) (quoting *Smolnikar*, 787 F.Supp.2d at 1315) (same). Because there is no well-developed maritime law pertaining to false imprisonment,[2] it is appropriate to incorporate principles of Florida law to this claim.

Under Florida law:

> To state a cause of action for false imprisonment, the plaintiff must establish: '1) the unlawful detention and deprivation of liberty of a person 2) against that person's will 3) without legal authority or "color of authority" . . . 4) which is unreasonable and unwarranted under the circumstances.'

---

[2] Indeed, it is questionable whether maritime law even recognizes a claim for false imprisonment. *See, e.g., Richards v. Royal Caribbean Cruises Ltd.*, 118 F.Supp.2d 150, 152-53 (D.P.R. 1999) ("[F]alse imprisonment is not the type of traditional maritime tort which general admiralty law embraces."); *but see Butts v. ALN Group, LLC*, 512 F.Supp.3d 1301, 1308 (S.D. Fla. 2021) ("The Court disagrees that the tort of false imprisonment is not available under general admiralty law."). **Solely** for the purposes of this motion, Celebrity will proceed as though maritime law recognizes a claim for false imprisonment.

*See Archer v. City of Winter Haven*, 846 F. App'x 759, 763 (11th Cir. 2021) (quoting *Harder v. Edwards*, 174 So.3d 524, 530 (Fla. 4th DCA 2015)) (ellipses in original); *see also Anderson v. Ahluwalia*, 587 F.Supp.3d 1179, 1191 (S.D. Fla. 2022) *vacated in part on other grounds* 2022 WL 3156409 (11th Cir. Aug. 8, 2002) (same).  "'[A] person is not liable for false imprisonment unless his act is done for the purpose of imposing a confinement, or with knowledge that such confinement will, to a substantial certainty, result from it.'"  *See Archer*, 846 F. App'x at 765 (quoting *Johnson v. Weiner*, 19 So.2d 699, 700 (Fla. 1944)); *see also Hernandez v. Metro-Dade County*, 992 F.Supp. 1365, 1369 (S.D. Fla. 1997) (same).

Count II fails to state a cause of action for false imprisonment because, according to the facts alleged in the amended complaint, Plaintiffs' "detention" was not unlawful, as required by the second element; was not "without legal authority," as required by the third element; and was not unreasonable and unwarranted ***under the circumstances***, as required by the fourth element.

Plaintiffs were fired for theft on March 30, 2020.  Plaintiffs could not be sent back to The Philippines the next day (March 31) because, at that time, the ship was docked in California and the CDC's No Sail Order ***prohibited*** Plaintiffs from disembarking the ship and entering the United States. Am. Compl., ¶29; *see also* 85 Fed. Reg. 16628 (March 24, 2020).  At the threshold, then, it was ***not*** Celebrity that prevented Plaintiffs from leaving the ship on March 31—it was the United States Government's issuance of the No Sail Order that "detained" Plaintiffs.

Putting aside ***who*** kept Plaintiffs on the ship, Plaintiffs' "detention" was not intentional false imprisonment.  The No Sail Order required Plaintiffs to remain on the ship and made it unlawful for Plaintiffs to leave the ship, which means the "detention" was not unlawful (second element) or without legal authority (third element).  Additionally, the fact that the No Sail Order prohibited Plaintiffs from leaving the ship also means that Plaintiffs' "detention" was not

7

"unreasonable and unwarranted under the circumstances" (third element). There was no false imprisonment beginning on March 31, 2020. Instead, there was a government order that made it impossible for Plaintiffs to disembark the ship, and required them to remain aboard.

The amended complaint alleges that on April 23, 2020 – 23 days into the 58-day period over which Plaintiffs are suing – the CDC *first* announced that foreign crew could leave their ships and enter the United States for the purpose of traveling *directly* to their homes. Am Compl., ¶43; Ex. 1. However, even then the U.S. Government would *not* let a crew member simply leave the ship if that is what he or she wanted to do. *Id.* Instead, the Government required the cruise lines' most senior management to swear – subject to the imposition of personal criminal liability, including imprisonment – that the return travel of each and every one of the thousands of crew members leaving the ships to travel abroad would comply with the CDC's various rules that included things such as "hav[ing] no interaction with the public during their travel home or to their new duty station (e.g., rental car companies, restaurants, other public areas, etc.)." Ex. 1.

The amended complaint concedes that the threat of criminal prosecution caused concern and gave Celebrity's executives pause because they would be agreeing to go to prison if any of the thousands of foreign crew violated any of the CDC's rules. Am. Compl. at ¶50 & p.14 n.7. The executives' concern about swearing, subject to the imposition of personal criminal liability, that thousands of people would each comply with the CDC's onerous travel requirements – which concern Plaintiffs seem to allege caused them to be detained beginning on April 23, 2020 – was not "unreasonable and unwarranted under the circumstances" (third element).

The amended complaint concedes that despite that well-founded concern, Celebrity informed its crew on May 3, 2020 that its executives would sign the attestation in the hope that the threat of criminal prosecution would ultimately be withdrawn. Am. Compl. at ¶50 & p.14 n.7.

And, on May 26, Plaintiffs and 200 other Filipino citizens aboard the *Millennium* were flown to The Philippines on a charter flight that was arranged and paid for by Celebrity. DE 10; *see also Maglana*, 2022 WL 3134373, at *2.

The amended complaint's allegations regarding this period of time – from May 3, when Celebrity said it would sign the attestation; to May 26, when Plaintiffs left the ship to travel to The Philippines – are sparse, to be charitable. Am. Compl., ¶51. Plaintiffs' position appears to be that it took Celebrity too long to get them to The Philippines after Celebrity agreed to sign the attestation, thus falsely imprisoning Plaintiffs aboard the ship. However, any such position is belied by the materials cited and linked in the amended complaint, which control over any contrary allegations in the amended complaint. *See Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007) (quoting *Simmons v. Peavey-Welsh Lumber Co.*, 113 F.2d 812, 813 (5th Cir. 1940)) ("'Where there is a conflict between allegations in a pleading and exhibits thereto, it is well settled that the exhibits control.'").

The CDC required that *every* flight that Plaintiffs and the other crew members would take to get their countries – not just the outbound flights from the United States, but also all connecting flights occurring entirely abroad – be private charter flights. Ex. 1. The CDC required that all ground transportation, in the United States *and* abroad until the crew members reached their "respective homes or new duty stations," be conducted by "industry-chartered private transport" or "personal vehicles (no rental cars, taxis, or ride-share services)." Ex. 1. Once a crew member's journey home started, the CDC required that the crew member "will not have a transportation layover exceeding 8 hours." Ex. 1. And, obviously, Plaintiffs could not be flown or otherwise transported to The Philippines unless and until that nation's borders were open and Plaintiffs were permitted to enter.

That it took 23 days for Celebrity to arrange travel from California to The Philippines in the middle of pandemic and global quarantine – travel that was required, under penalties of criminal liability, to comply with the CDC's onerous requirements – is not "unreasonable and unwarranted under the circumstances."

Count II should be dismissed with prejudice because Plaintiffs cannot state a claim for false imprisonment occurring between March 31 and May 26, 2020.

**B.  Count V, For Intentional Infliction Of Emotional Distress, Fails To State A Claim.**

Count V of the amended complaint purports to state a claim for intentional infliction of emotional distress (IIED). Plaintiffs allege that Celebrity keeping them aboard the ship "unlawfully and without just cause" gives rise to a claim for IIED. Am. Compl. at ¶103. Plaintiffs' purported cause of action for IIED should be dismissed with prejudice because it fails to state a claim.

"Courts sitting in admiralty typically look to the standards set out in the Restatement (Second) of Torts § 46 (1965) as well as state law to evaluate claims for intentional infliction of emotional distress ('IIED')." *See Wu v. NCL (Bahamas) Ltd.*, 2017 WL 1331712, at *2 (S.D. Fla. Apr. 11, 2017) (citing *Wallis v. Princess Cruises, Inc.,* 306 F.3d 827, 841 (9th Cir. 2002)). A claim for IIED requires a plaintiff to plead and prove that, among other things, the defendant engaged in "extreme and outrageous conduct." *See id.* The cause of action for IIED is "sparingly recognized" and "[a] plaintiff alleging IIED faces an extremely high burden . . . ." *See id.* "This sparse recognition is reflected in the [] maritime cases addressing claims of IIED." *See Kantrow v. Celebrity Cruises Inc.*, 510 F.Supp.3d 1311, 1324 (S.D. Fla. 2020). "Whether conduct is sufficiently 'outrageous' to state a claim for IIED is a question of law for the Court to decide." *See Garcia v. Carnival Corp.*, 838 F.Supp.2d 1334, 1339 (S.D. Fla. 2012).

The heightened burden required for IIED claims simply is not met here. As set out more fully above, the CDC's No Sail Order prohibited Plaintiffs from leaving the ship and required them to stay aboard. Then, the CDC changed its rules and allowed crew members to leave their ships and enter the United States for the sole and limited purpose of travelling directly to their countries, but *only* if Celebrity's top executives swore – under penalty of personal criminal liability – that each of Celebrity's thousands of crew members would comply with the CDC's rules until they reached their homes in The Philippines). Once that window opened, Celebrity arranged the travel that would take Plaintiffs and the hundreds of other Filipino crew aboard the *Millennium* from California to The Philippines – ***in the midst of a pandemic and global quarantine*** – in a way that satisfied (a) the CDC's logistically challenging requirements of ensuring that Plaintiffs would not encounter any member of the public at any time from the moment Plaintiffs and the others left the ship in California until they arrived at their respective houses in The Philippines, and (b) The Philippines' requirements, including when it would permit the crew to return.

Those facts – which come from the amended complaint and the materials it cites and links – do not come anywhere close to stating a claim for IIED, and, indeed

> [a] brief survey of Florida and maritime cases addressing claims of IIED underscores this point. *See, e.g., Rubio v. Lopez*, 445 Fed.Appx. at 175 (finding failure to allege sufficient outrageous conduct where deputy sheriff hobble-tied arrestee on black asphalt pavement in sun, resulting in second-degree burns to face and chest); [*Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 842 (9th Cir. 2002)] (finding no outrageous conduct where crew member on cruise ship remarked in the plaintiff's hearing after her husband fell overboard that her husband was probably dead and that his body would be sucked under the ship, chopped up by the propellers, and would probably not be recovered); *Garcia v. Carnival Corp.*, 838 F.Supp.2d 1334, 1339 (S.D. Fla. 2012) (Moore, J.) (finding no outrageous conduct where crew members assaulted cruise passenger and prevented her from leaving her room for a period of time); [*Vamper v. United Parcel Service, Inc.*, 14 F.Supp.2d 1301, 1306-07 (S.D. Fla. 1998)] (finding no outrageous conduct where defendants fabricated reckless driving charge against plaintiff, called

him the "n" word, threatened him with termination, and physically struck him on ankle).

*See Wu*, 2017 WL 1331712, at *2 (parentheticals in original) (additional internal quotation marks and citation omitted); *see also Kantrow*, 510 F.Supp.3d at 1324-25. The time that Plaintiffs spent on the ship after their employment was terminated does not give rise to a clam for IIED.

Two more things merit brief mention. ***First***, the claim for IIED alleges that Plaintiffs were kept on the ship "unlawfully and without just cause, perpetually, ***without wages***[,]" which added to their emotional distress. Am. Compl. at ¶103 (emphasis added). Whether Plaintiffs were required to be paid wages while they remained aboard the ship – and whether they were paid wages during that time – are the same issues that were raised in the claim for unpaid wages and penalty wages (Count IV) for which the Court compelled arbitration and that Plaintiffs did ***not*** challenge on appeal. Any and all wage-related issues are required to be determined in arbitration, and if Plaintiffs' position is that the claim for IIED requires the determination of wage-related obligations arising under the collective bargaining agreement – the same agreement that contains the arbitration provision – then the claim for IIED must be dismissed in favor of arbitration.

***Second***, the claim for IIED includes allegations that because Plaintiffs were kept on the ship, they were "continually exposed to the pandemic[3]," which added to their emotional distress. Am. Compl. at ¶105. Those allegations fail to state a claim for IIED because it is well-settled that being exposed to illness – and even contracting illness as a result of such exposure – does not give rise to a claim for IIED. *See, e.g., Kantrow*, 510 F.Supp.3d at 1325-26 (dismissing IIED claim with prejudice where cruise passengers alleged they were exposed to and contracted COVID-19 while on a cruise ship); *Brown v. Royal Caribbean Cruises Ltd.*, 2017 WL 3773709, at **1, 3

---

[3] In saying that they were exposed to "the pandemic," Plaintiffs presumably intended to say that they were exposed to the virus.

(S.D. Fla. Mar. 17, 2017) (granting a motion to dismiss a claim for IIED brought by a cruise passenger who contracted Legionnaires' disease while onboard and "was hospitalized for seven days and suffered kidney disease, congestive heart failure, and pulmonary failure, among other things," where the plaintiff alleged that the cruise line waited until after the cruise began to inform passengers of the presence of Legionnaires' disease on the vessel and that passengers on the immediately preceding cruises had contracted the disease) ("While the Plaintiff's allegations describe truly objectionable behavior, the allegations simply do not rise to the level of outrageousness required by the applicable case law."); *Negron v. Celebrity Cruises Inc.*, 2018 WL 3369671, at **1, 3 (S.D. Fla. July 10, 2018) (granting a motion to dismiss a claim for IIED where the plaintiff alleged that the cruise line transported her to a local hospital where she and her family were exposed to Ebola after the onboard medical personnel misdiagnosed her with a heart attack) ("Even construing the facts in the light most favorable to the Plaintiffs, the Defendant's conduct is not such that it goes beyond all possible bounds of decency and is regarded as utterly intolerable in a civilized community. While the Plaintiffs' allegations describe distressing events, the allegations simply do not rise to the level of outrageousness required by the applicable case law.") (internal quotation marks and citation omitted).

   Count V, for intentional infliction of emotional distress, should be dismissed with prejudice because it fails to state a claim.

### III.     CONCLUSION

For these reasons, Celebrity respectfully requests the entry of an Order dismissing with prejudice Counts II and V of the amended complaint, which are the only counts of the amended complaint that remain at issue in this action.

Respectfully submitted,

HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
(305) 374-8500 (telephone)
(305) 789-7799 (facsimile)

By: /s/  Scott D. Ponce
Alex M. Gonzalez (FBN 0991200)
alex.gonzalez@hklaw.com
Scott D. Ponce (FBN 0169528)
sponce@hklaw.com

HAMILTON, MILLER, & BIRTHISEL LLP
Jerry D. Hamilton (FBN 970700)
jhamilton@hamiltonmillerlaw.com
Evan S. Gutwein (FBN 58741)
egutwein@hamiltonmillerlaw.com
150 S.E. Second Avenue, Suite 1200
Miami, Florida 33131
(305) 379-3686 (telephone)
(305) 279-3690 (facsimile)

Attorneys for Defendant

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 25, 2023 I electronically filed this document using the Court's CM/ECF system, which will automatically serve a copy on all counsel of record.

By: /s/  Scott D. Ponce